UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

————————————————————————

DAVID K. McCALLUM,

                      Petitioner,

       -vs-

SUPERINTENDENT HAROLD GRAHAM, Auburn
Correctional Facility,

                      Respondent.

**No. 6:14-cv-06571-MAT**
**DECISION AND ORDER**

————————————————————————

## I.    Introduction

Proceeding <u>pro</u> <u>se</u>, David K. McCallum ("Petitioner") seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on the basis that he is unconstitutionally detained in Respondent's custody as the result of a judgment of conviction entered against him on February 11, 2010, in State of New York County Court, Erie County (Franczyk, J.), following a jury verdict convicting him of one count of Manslaughter in the First Degree (N.Y. Penal Law ("P.L.") § 125.20(1)). Petitioner is currently serving a determinate term of 18 years to be followed by 5 years of post-release supervision.

## II.  Factual Background and Procedural History

In February of 2008, Paul Krieger ("Krieger") and his girlfriend, Jennifer Rammacher ("Rammacher"), were tenants of the second-floor apartment at 890 East Eagle in the City of Buffalo, which was owned by Petitioner. On the night of February 7, 2008, Rammacher decided to stay at her parents' house, since Krieger had

recently been incarcerated, and the lower apartment at 890 East Eagle was vacant. Upon arriving at the house to collect some of her things, Rammacher found the doorframe damaged and heard music coming from the attic. When she asked who was there, a man responded, "It's Puerto Rican Jimmy," i.e., James Urbinato ("Urbinato"). Rammacher was acquainted with Urbinato since she, Krieger, Petitioner, and Urbinato had hung out together in the apartment several times prior to February 7, 2008. However, Rammacher had not given Urbinato permission to be there, so she told him to leave. According to Rammacher, Urbinato was "running around like a maniac" and waving a gun that "[a]bsolutely" appeared to be real, not a toy. (T.450). Urbinato claimed that the door had been kicked in before he had arrived, that he was guarding the house, and that he was going to shoot the landlord, his dog, and anyone else who walked into the house. (T.473-74). Rammacher insisted that Urbinato leave or she would call the police. Eventually, Urbinato left on his own accord. Rammacher then called Jesse Halliday ("Halliday"), who did maintenance work at the apartment, and asked him to talk to Petitioner about fixing the door. She also mentioned her encounter with Urbinato and the gun, and the threats he had made about shooting Petitioner and his dog.

The following morning, Petitioner called Rammacher on his way to her apartment. About 20 minutes later, he called again, saying that he had found Urbinato in her bedroom and that Urbinato had

attacked him with a hammer. Petitioner told her that he had disarmed Urbinato and punched him, knocking him to the floor. Urbinato then had reached for a screwdriver in the back pocket of his pants, but Petitioner had picked him up and carried him down the stairs. Petitioner told Rammacher to call 911 and report an intruder in her apartment. When Rammacher called the police, they asked her to come to 890 East Eagle, where she found the house being treated as a crime scene.

Rammacher's boyfriend, Krieger, testified for the prosecution in exchange for a reduction in the criminal charge pending against him. Krieger had known Petitioner for about 10 years and Urbinato for between 5 to 7 years. Urbinato was "just a drug addict basically," and Krieger allowed Urbinato to work with him to earn some money. About a month prior to Petitioner's encounter with Urbinato, Krieger was talking to a group of people, including Petitioner, and mentioned that the gun Urbinato carried around was fake. Krieger said Urbinato was not a "tough guy"; Krieger had never seen him become aggressive or violent.

Halliday testified for the prosecution that he had been friends with Petitioner for a long time, and had done construction work with him for about 10 years. Halliday had known Urbinato for about 10 years. He once saw Urbinato get into a fight, which Urbinato "didn't win[.]" (T.509).

On the morning of February 8, 2008, Halliday met Petitioner at Rammacher's apartment where they found Urbinato standing in the rear bedroom, looking as though he had just woken up. Petitioner "advanc[ed]" on Urbinato and told him "'to get the "F" out of [there].'" (T.514). Urbinato retorted that he was there with Rammacher's permission; Petitioner replied that he had just spoken with Rammacher who said she did not want him there. Since they had been told by Rammacher that Urbinato had a gun, Petitioner kept asking Urbinato where it was. (T.538). Petitioner was "inching up, saying come on, . . . get the F out of here and that's when [Urbinato] reached for something in his pocket" that had a wooden handle. Whatever Urbinato was reaching for got stuck, and that is when Petitioner punched him hard in the face. (T.515). Urbinato "kind of flew back" and "did like a little somersault[.]" (T.516). Before Urbinato could get up, Petitioner "grabbed him and flipped him over and slammed him on his back into the kitchen area." (T.517). Halliday said that Urbinato was not moving at all while Petitioner was rapidly "flipping him" "back and forth" about 4 or 5 times. (T.518). During this time Petitioner removed a "couple screwdrivers" and the wooden-handled object, which was a hammer, from Urbinato's person. (T.518-19). Halliday said that Urbinato never landed a blow against Petitioner. (T.519). Urbinato "kind of lifted his arms" and said, "all right, all right, something of that nature." (T.521). Halliday did not have trouble understanding

-4-

Urbinato. Petitioner repeatedly told him, "[T]hen get the F out of here, get going, beat it." (T.521). When Urbinato did not move from where he was lying on the floor, Petitioner grabbed him by the shoulders with both hands and dragged him down the stairs. (T.522). Because Urbinato was "bleeding pretty badly" and "too stubborn" to go to the hospital, Halliday phoned one of Urbinato's friends to let him know of Urbinato's condition. (T.522-23).

After getting off the phone with Urbinato's friend, Halliday left because of all the blood; "it was just kind of gory[.]" (T.524). At that point, Urbinato was standing on the front steps and holding onto the railing. His pants, which were too big for him, had fallen down around his ankles when he was being dragged down the stairs.  Halliday heard Urbinato remark to Petitioner, "[W]hy [are] you doing this to me[?]" (T.523). Petitioner was on the phone with 911 when Halliday left.

Later, Petitioner asked Halliday for advice about what to do. Halliday advised him to go back to Rammacher's apartment, even though he would be arrested if he did so. (T.539).

Officer Paul Sobkowiak ("Sobkowiak") of the Buffalo Police Department ("BPD") responded to a 911 call about a burglary at 890 East Eagle. Arriving about 10 minutes after the call had come in, he found Urbinato, not wearing shoes or pants, lying in a "contorted position" in blood-stained snow. Urbinato was "in bad condition" and looked as though he "might have been run over."

(T.545). When Sobkowiak tried to speak with him, Urbinato made only a "gurgling sound" and lost control of his bowels. (T.545).

Paramedic Sue McMahon ("McMahon") found Urbinato unresponsive to any stimuli. His left eye was swollen shut and had a "deviated gaze" when she lifted up the eyelid; his right eye did not react to stimuli. He was exhibiting decorticate and decerebrate posturing, and he did not flinch when she inserted a large needle into his arm. (T.575-77). McMahon suggested to the lieutenant that he call in homicide detectives because she felt that Urbinato "probably wouldn't make it." (T.578).

Several days later, Detective James Lonergan of the BPD searched the interior of 890 East Eagle. While he was there, he encountered a woman who handed him a cell phone; Petitioner was on the line. Lonergan told Petitioner that the police wanted to speak to him about an assault that had occurred at the house. Petitioner told Lonergan that Urbinato had come after him with a hammer and screwdriver, so Petitioner hit him. Lonergan told Petitioner to come down to the station to give a statement, but Petitioner did not do so that day.

After Detective Mark Vaughn issued a "be on the lookout" notice for Petitioner, attorney James DeMarco, Esq. ("DeMarco") contacted the BPD about having Petitioner give a statement. On February 21, 2008, Petitioner and DeMarco went to the BPD, but Petitioner did not bring the hammer and screwdriver with which

-6-

Urbinato allegedly had threatened him. After waiving his rights, Petitioner gave a written, signed statement. Petitioner said that when he first encountered Urbinato at Rammacher's apartment, he wanted him to stay "calm because [Rammacher] said he had a gun" and had threatened to shoot Petitioner and his dog. (T.623-24). Petitioner told Urbinato he had to leave; Urbinato kept asking why. Petitioner

> told [Urbinato] that [Rammacher] didn't want him there.
> We were close to each other now. I put my hand up to wave
> him out of the apartment. All of a sudden he reached
> towards his waist and grabbed the hammer he had there. I
> thought I was going to have my head split open. I just
> threw a punch. It connected with his face. [Urbinato]
> fell back.
> . . .

At that point, Petitioner stated, Urbinato was on his knees, trying to get to the back bedroom. Thinking Urbinato might have a weapon in that room, Petitioner grabbed him and pulled him back, taking the hammer away from him as well as two screwdrivers. After frisking Urbinato front and back, Petitioner did not find a gun. (T.624). Even though he told Urbinato to go, Urbinato "wasn't making any effort to get up." (Id.). At this point, Petitioner said, Urbinato's eyes were open and he was speaking coherently. He picked Urbinato up by his shoulders and "guided him down the stairs." (T.625). Once he got Urbinato downstairs, Petitioner noticed that Urbinato, though conscious, was "bleeding bad" and "breathing hard." (Id.). Petitioner was telling him to leave, but

Urbinato got up and was trying to get back into the house. Petitioner was standing on the porch steps and speaking to 911. Urbinato was talking and "trying to get to [him]" so Petitioner "pushed him with [his] foot and he went down." (T.625). Petitioner went back inside and retrieved his tools. He saw Urbinato's necklace in the kitchen and his boots by the stairs, so he tossed them outside near Urbinato. Petitioner then left because there was an outstanding warrant against him. (T.625). He said that if he had known how badly Urbinato was hurt, he would have stayed, even if it meant going to jail on the warrant. (T.627).

Dr. James Woytash, Chief Medical Examiner for Erie County ("Dr. Woytash" or "the ME") performed the autopsy on Urbinato. He testified that the victim's brain was markedly asymmetrical and edematous, and exhibited areas of herniation. (T.640-41). There were no injuries on the victim's front chest but there were clusters of abrasions on both knees, a small abrasion on the knuckles, bruising and abrasions on the small of the back, and severe bleeding into the right and left buttocks due to multiple hits on both sides of the buttocks. (T.643). Urbinato had suffered three subdural hematomas,[1] located on the left side, right side, and right rear of the brain.[2] In a person of his age, it would have

---

[1]

A hematoma occurs when the blood vessels get ripped and torn, and the blood starts to leak out into the underlying tissue. (T.646).

[2]

The results of the autopsy indicated that there was "extensive hemorrhage in the soft tissues of the entire left side of the head, right side of the head

taken severe blunt force to cause such subdural hematomas. (T.644-45, 646). Dr. Woytash testified that "[a]ny type of bleeding on the brain is going to prevent a person . . . from being able to function in a normal stage [sic]." (T.645). He opined that even after sustaining one subdural hematoma, Urbinato would not have been able to be aggressive, and was "absolutely not going to be able to function normally, not be able to talk normally or do anything normal." (T.651). According to the ME, it was "[a]bsolutely impossible" for a person with a subdural hematoma to "go from standing up and speaking clearly, to passed out" "with no ability to speak or move without having some physical trauma inflicted upon him[.]" (T.652). The ME testified that the multiple subdural hematomas sustained by the victim could not have been caused by one punch. (Id.). The cause of death was multiple blunt force injuries; the manner of death was homicide. (T.648).

On cross-examination, Dr. Woytash admitted that one of the subdural hematomas could have occurred by Urbinato simply collapsing and his head hitting the floor. (T.655). Dr. Woytash testified, however, that the bleeding into the victim's buttocks could not have been generated by being dragged down or banged against a flight of 10 to 15 stairs. (T.657).

---

and entire back of the head." Pathological Examination, p. 3, Ex. G to Petitioner's First C.P.L. § 440.10 Motion. The left hemorrhage was 8"×7½"; the hemorrhage of the right temporalis muscle was 4×3×¼"; and the acute subdural hematoma of the right front parietal and temporal bones measured 4"×5"×1/4". Id.

At defense counsel's request, the trial court instructed the jury on second-degree manslaughter as a lesser included offense. The jury returned a verdict convicting Petitioner of first-degree manslaughter, and he was sentenced as noted above. Petitioner's conviction was unanimously affirmed on direct appeal, see People v. McCallum, 96 A.D.3d 1638 (4th Dep't), lv. denied, 19 N.Y.3d 1103 (2012). His two pro se motions to vacate pursuant to N.Y. Crim. Proc. Law ("C.P.L.") § 440.10 were unsuccessful.

This timely habeas petition followed in which Petitioner asserts the following grounds for relief: (1) the prosecutor relied on false evidence to secure the conviction; (2) the prosecutor committed misconduct during summation; (3) the verdict was based on unreliable evidence; (4) trial counsel was ineffective; (5) the sentence was vindictive; and (6) the verdict was based on legally insufficient evidence.

### III. Standard of Review

The instant petition is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). By its terms, 28 U.S.C. § 2254(d) bars relitigation of any claim "adjudicated on the merits" in state court, subject only to the exceptions in §§ 2254(d)(1) and (2). Harrington v. Richter, 562 U.S. 86, 98 (2011) ("Richter") (citing Williams v. Taylor, 529 U.S. 362, 412 (2000)). Summary rulings by a state court may constitute adjudications on the merits for purposes of AEDPA.

See Richter, 131 S. Ct. at 100 (§ 2254(d) "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits'").

## IV. Merits of the Petition

### A. Conviction Obtained Through the Use of False Evidence (Ground One)

Petitioner asserts that the prosecutor's theory of the case was "supported solely by the ME's opinion" which the prosecutor "knew" was "false." Petitioner is referring to the opinion testimony by Dr. Woytash that a person with even one subdural hematoma would not be able to talk, walk, or do anything normally. (T.633-52). Petitioner asserts that the prosecutor knowingly suborned perjury since he was in possession of certain medical records indicating that the victim was talking when the police first arrived on the scene. (See T.640—45). Petitioner contends that these documents "factually disproved" Dr. Woytash's testimony.

The Supreme Court has held that "[a] conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment[,]" Napue v. Illinois, 360 U.S. 264, 269 (1959). Here, however, Petitioner has not demonstrated that witnesses testified falsely, much less that they provided inconsistent testimony about the same events. Rather, he is comparing "apples to oranges"—i.e., the opinion testimony of an expert, and the observations by eyewitnesses. Even if the comparison were apt, it is well settled that "'discrepancies and

-11-

inconsistencies in the record' are not "proof" that perjury was committed at trial.'" Campbell v. Greene, 440 F. Supp. 2d 125, 147 (N.D.N.Y. 2006) (quoting Edwards v. Dretke, No. CIV.05-0526, 2005 WL 3504121, at *6 (S.D. Tex. Dec. 21, 2005); other citations omitted). Indeed, the Second Circuit has held that "even a direct conflict in testimony does not in itself constitute perjury." United States v. Gambino, 59 F.3d 353, 365 (2d Cir. 1995). Petitioner has simply pointed out inconsistences in the testimony of certain witnesses and described alleged discrepancies between the testimony and certain records. This is insufficient, as a matter of law, to establish that the prosecutor knowingly suborned perjury or allowed false evidence to be put before the jury. See, e.g., Dixon v. Conway, 613 F. Supp.2d 330, 372-73 (W.D.N.Y. 2009) ("Since the only 'proof' provided by Dixon in support of his claim of perjury is based upon inconsistencies in the testimony of some of the prosecution witnesses, as well differences between the testimony of prosecution witnesses and petitioner's witnesses' version of events, Dixon has not established that any of the testimony upon which this aspect of his claim of actual innocence is based was, in fact, perjurious.").

## B.   Prosecutorial Misconduct (Ground Two)

Petitioner contends that the prosecutor violated his due process right to a fair trial by making "numerous statements—consisting of his personal opinion, which directly

contradicted evidence that he presented—suggesting that Petitioner was a liar and had fabricated his defense" and "suggested to the jury during summation that they would not be following the law if they did not find Petitioner guilty." The Fourth Department rejected this claim without discussion. See McCallum, 96 A.D.3d at 1640-41 ("We have examined defendant's remaining contentions in his main and pro se supplemental briefs and conclude that none requires reversal or modification.").

A claim of prosecutorial misconduct on habeas corpus is reviewed under "the narrow [standard] of due process, and not the broad exercise of supervisory power." Floyd v. Meachum, 907 F.2d 347, 353 (2d Cir. 1990) (citation omitted). Generally, inappropriate prosecutorial comments, standing alone, are insufficient to reverse a conviction. United States v. Young, 470 U.S. 1, 11 (1985). Rather, the reviewing court must assess the impact of the improprieties on the fairness of the trial as a whole. Id.

Petitioner primarily complains that the prosecutor made comments denigrating the defense, e.g., that Petitioner's "hammer story was ridiculous." (T.738). The prosecutor argued that if Petitioner's version of events were true, the jury should have expected to hear that he had remained at the scene, provided his version of the altercation to the first responders, and perhaps shown police the hammer and screwdriver with which Urbinato had

attacked him. However, the prosecutor observed, none of these things had happened. Although a prosecutor may not suggest that a defendant has an affirmative obligation to present evidence on his own behalf, once a defendant does in fact put on a defense case, the prosecutor may fairly comment on the defense's failure to call witnesses to support his factual theory. See United States v. Yuzary, 55 F.3d 47, 53 (2d Cir. 1995) (finding that the prosecutor was entitled to comment on the defendant's "'failure . . . to support his own factual theories with witnesses'") (quoting United States v. Barnes, 604 F.2d 121, 148 (2d Cir. 1979); further citations omitted)); see also, e.g., Ford v. Ricks, No. 01-CV-0775A VEB, 2007 WL 9225082, at *7 (W.D.N.Y. Feb. 27, 2007), R&R adopted, No. 01-CV-775, 2007 WL 9225110 (W.D.N.Y. Oct. 5, 2007) (no misconduct where prosecutor "commented that there was no proof to support defense counsel's theory of deliberate misidentification by the victims" and stated, e.g., "'there is nothing to this defense whatsoever. . . .'") (internal citations to record omitted).

After reviewing the entire trial transcript, with particular attention to the comments challenged by Petitioner, the Court finds that there was no due process violation of his right to a fair trial. Most of the comments were within the bounds of acceptably zealous advocacy, and those that exceeded such bounds were not "so prejudicial that they rendered the trial in question fundamentally unfair." Garofolo v. Coomb, 804 F.2d 201, 206 (2d Cir. 1986). See,

e.g., Pina v. Kuhlmann, 239 F. Supp. 2d 285, 290 (E.D.N.Y. 2003) (summation did not violate petitioner's due process rights where prosecutor characterized petitioner's testimony as "ridiculous" "utter nonsense" and stated that "it makes no sense"). Since Petitioner's prosecutorial misconduct claim is not meritorious under a de novo standard of review, it necessarily cannot provide a basis for habeas relief under AEDPA's more deferential standard.

## C.   Claims Regarding the Evidentiary Sufficiency of the Conviction

### 1.   Conviction Based on Unreliable Evidence (Ground Three)

Petitioner argues that the evidence to support his conviction was unreliable because, inter alia, Dr. Woytash allegedly contradicted his own opinion testimony, which, according to Petitioner, also was factually incorrect. It is well settled that the credibility and reliability of witness testimony are issues of fact to be determined by the jury. See, e.g., Mason v. Brathwaite, 432 U.S. 98, 116 (1977) (noting that "reliability of the identification" was "evidence for the jury to weigh" notwithstanding that it contained "some element of untrustworthiness"); United States v. Strauss, 999 F.2d 692, 696 (2d Cir. 1993) (stating that "the jury is exclusively responsible for determining a witness' credibility") (citation omitted). Petitioner's claim based on the allegedly "unreliable" evidence presented at trial therefore does not present a cognizable

constitutional issue amenable to habeas review. See, e.g., Cole v. Rock, No. 12-CV-6587 NSR PED, 2013 WL 5323733, at *13 (S.D.N.Y. Sept. 20, 2013) (petitioner's arguments that witness was "unreliable because [he] could only vaguely describe the perpetrator after the incident, there was a one-month time period between the crime and identification, and he did not have an opportunity to form an accurate memory of the perpetrator" were "beyond the scope of review of a habeas court") (citing Perkins v. Comm'r of Corr. Servs., 218 F. App'x 24, 25 (2d Cir. 2007) (unpublished opn.) (rejecting habeas challenge to sufficiency of evidence which "center[ed] on the reliability and credibility of the sole eyewitness to the crime"; "[a]ssuming that eyewitness testimony has been properly admitted, its credibility is for the jury"); Bonton v. Ercole, 08 Civ. 526, 2008 WL 3851938, at *8 (E.D.N.Y. Aug. 18, 2008) ("[I]t is not the court's role to decide whether petitioner's interpretation of the forensic evidence is more appropriate than the jury's.")).

## 2. Legal Insufficiency of the Evidence (Ground Six)

Petitioner argues that the prosecution presented insufficient evidence that he "intended to cause serious physical injury" to Urbinato. See Pet., p. 14B. Petitioner indicates that this claim has not been exhausted and that he has raised it in an application for a writ of error coram nobis that was pending in the Fourth Department at the time he filed his habeas petition. See Pet.,

p. 14C. Respondent has not asserted the defenses of non-exhaustion and procedural default in regards to this claim; nor has Respondent addressed whether an insufficiency-of-the-evidence claim properly may be exhausted by means of an application for a writ of error coram nobis. Rather than attempt to unravel the potentially complex procedural issues that might bar review of this claim, the Court, in the interest of judicial economy, will consider it on the merits.

"When considering the sufficiency of the evidence of such a state conviction, a federal court 'must consider the evidence in the light most favorable to the prosecution and make all inferences in its favor,' and, in doing this, 'must look to state law to determine the elements of the crime.'" Gutierrez v. Smith, 702 F.3d 103, 113 (2d Cir. 2012) (quotation and internal quotation marks omitted)). Under New York law, "[a] person is guilty of manslaughter in the first degree when . . . [w]ith intent to cause serious physical injury to another person, he causes the death of such person . . . ." N.Y. PENAL LAW § 125.20(1). The critical question is whether, after viewing the evidence in the light most favorable to the prosecution, and drawing all reasonable inferences in its favor, any reasonable jury, see Jackson v. Virginia, 443 U.S. 307, 319 (1979), could have found, beyond a reasonable doubt, that Petitioner, while possessing the intent to cause serious physical injury to Urbinato, caused Urbinato's death.

Petitioner argues that there was insufficient evidence to prove intent because (1) Dr. Woytash testified that the "injuries were consistent with non-intentional causes"; (2) after removing the hammer and screwdrivers from the victim's person, Petitioner threw them into a corner; and (3) Petitioner called 911 "for the sole purpose of requesting an ambulance to help decedent." As to the first argument, although Dr. Woytash conceded that *one* of the subdural hematomas could have been caused by the victim falling and hitting his head, the victim suffered a total of *three* acute subdural hematomas. In addition, the victim sustained severe bruising in his lower back and buttocks which Dr. Woytash testified could not have been caused unintentionally by bumping against 10 to 15 steps in the course of being dragged down the stairs. See, e.g., People v. Ramos, 19 N.Y.3d 133, 136 (2012) (conclusion that conviction for first-degree manslaughter was supported by legally sufficient evidence was "not negated by the possibility that defendant's conduct also might have been deemed consistent with a reckless state of mind" because "[t]here is no contradiction in saying that a defendant intended serious physical injury, and was reckless as to whether or not death occurred"); People v. Steven S., 160 A.D.2d 743, 744 (1990) (evidence legally sufficient to prove intent to cause serious physical injury where, although there was some evidence indicating that the victim's injuries "may have occurred unintentionally when he grabbed the defendant, who was

holding a knife, from behind and spun him around," the victim "testified that when he grabbed the defendant's arm to prevent him from fleeing, the defendant 'lunged around' and stabbed him in the face").

With regard to fact that Petitioner did not use Urbinato's hammer and screwdrivers against him, this argument "focuses exclusively on the evidence favoring [Petitioner], and ignores the evidence favoring the prosecution." Gumbs v. Heath, No. 10-CV-848 SLT, 2013 WL 1345073, at *10 (E.D.N.Y. Mar. 29, 2013). Moreover, the prosecution was not required to prove that Petitioner utilized a weapon in order to prove intent to cause serious physical injury. Cf. People v. Muhammad, 17 N.Y.3d 532, 542 (2011) (stating that acquittals on weapon possession counts "did not inherently negate" the element of "intent to cause serious physical injury" of first-degree assault by means of a weapon).

Finally, while Petitioner's call to 911 for the purpose of summoning aid might have shown that he did not intend to cause Urbinato's death, it did not preclude the jury from inferring that, based on all of the other circumstances, including the severity of Urbinato's injuries, Petitioner intended to cause serious physical injury. See, e.g., People v. Steinberg, 79 N.Y.2d 673, 683 (1992) ("That defendant acceded to Nussbaum's request to telephone 911 when Lisa stopped breathing might demonstrate that defendant did not intend to cause the child's death, but does not militate

against the jury finding that he intended to cause serious injury."). Here, reasonable but contrary inferences were possible regarding Petitioner's intent. When "competing inferences" to be drawn from the evidence are "not unreasonable," they are "within the exclusive domain of the finders of fact," and are "not to be disturbed" by a court reviewing the sufficiency of the evidence. People v. Bueno, 18 N.Y.3d 160, 169 (2011) (brackets and internal citations omitted).

### D. Ineffective Assistance of Trial Counsel (Ground Four)

#### 1. The Strickland Standard

The two-part test for ineffective assistance claims set forth in Strickland v. Washington, 466 U.S. 668 (1984), requires a petitioner to demonstrate (1) that his counsel's performance was deficient, and (2) "that the deficient performance prejudiced the defense." Id. at 687. The Supreme Court has emphasized that counsel is "strongly presumed" to have rendered adequate assistance and to have made all significant decisions in the exercise of reasonable professional judgment. Id. at 686, 689-90. To demonstrate prejudice as a result of counsel's performance, the petitioner "must show that there is a reasonable probability that, but for" the alleged errors, the result of the trial would have been different. Id. at 694. For ineffective assistance claims that were "adjudicated on the merits," the "pivotal question is whether the state court's application of the Strickland standard was unreasonable[,]" which

is different from asking whether defense counsel's performance fell below <u>Strickland</u>'s standard." <u>Richter</u>, 131 S. Ct. at 785.

### 2.   Counsel's Alleged Errors

Petitioner reprises his claims, asserted in his <u>pro se</u> supplemental brief on direct appeal and in his <u>pro se</u> C.P.L. § 440.10 motions, that defense counsel was ineffective in (1) failing to discuss the merits of the pre-trial plea offers with him; (2) failing to counter Dr. Woytash's testimony with an expert witness and medical literature; (3) failing to introduce exculpatory documentary evidence; and (4) failing to object to prosecutorial misconduct. All of these claims were raised either in Petitioner's C.P.L. § 440.10 motions or in his <u>pro se</u> supplemental appellate brief, and denied on the merits. As discussed below, Petitioner has not shown that the State courts incorrectly applied <u>Strickland</u>, much less that they applied it in an objectively unreasonable manner.

### a.   Deficient Advice Regarding Plea Offers

On August 13, 2008, the prosecutor offered Petitioner the opportunity to plead guilty to second-degree manslaughter in exchange for a sentence of 5 to 15 years. The prosecutor noted that Petitioner faced a maximum of 25 years if convicted of first-degree manslaughter. Petitioner did not object when his then-attorney, Michael T. Kelly, Esq., rejected the plea offer.

At a pre-trial proceeding on February 2, 2009, the prosecutor made another plea offer (attempted first-degree manslaughter with a sentence promise of 3½ to 15 years). Petitioner was present with Robert M. Goldstein, Esq., the attorney who ultimately tried the case. Through counsel, Petitioner rejected this plea offer, which remained available until trial began.

When Petitioner raised this claim in his second C.P.L. § 440.10 motion, the trial judge aptly observed that Petitioner's "chief complaint" appeared to be defense counsel failed to convince him to plead guilty." However, as the judge correctly noted, "it would be improper for defense counsel to exert undue influence in convincing a defendant to plead guilty." While "an accused is entitled to rely upon his counsel . . . to offer his informed opinion as to what plea should be entered[,]" Von Moltke v. Gillies, 332 U.S. 708, 721 (1948), "the ultimate decision whether to plead guilty must be made by the defendant[,]" Purdy v. United States, 208 F.3d 41, 45 (2d Cir. 2000) (citation omitted). Although "a lawyer must take care not to coerce a client into either accepting or rejecting a plea offer[,]" id. (citation omitted), it is proper for an attorney rendering advice regarding plea offers to "take into account, among other factors, the defendant's chances of prevailing at trial, the likely disparity in sentencing after a full trial as compared to a guilty plea," "whether the defendant

has maintained his innocence, and the defendant's comprehension of the various factors that will inform his plea decision." Id.

Here, Petitioner adamantly maintained his innocence; indeed, counsel informed the judge when rejecting the second plea offer that Petitioner "feels that he's very innocent in this" and "feels he should have a trial." It is apparent, based on the transcripts of the court proceedings, that Petitioner was aware of the parameters of each plea offer, as well as the likely disparity in the sentences available as part of a plea bargain versus the sentences that could be imposed after a guilty verdict. Petitioner contends, however, that his first attorney misrepresented his chances of prevailing at trial when he commented, at the bail hearing, that he believed Petitioner had been "overcharged." According to Petitioner, this "was equivalent to telling [Petitioner] that [he] was not guilty of the charged crime." This argument, while creative, requires far too much of a logical stretch to reach the conclusion desired by Petitioner. It bears noting Petitioner does not allege that counsel stated he had been mistakenly charged or that he should not have been charged *at all*. An equally, if not more reasonable inference, is that counsel believed Petitioner should have been charged with a lesser crime, such as those to which he was offered the chance to plead guilty.

The Second Circuit has explained that "[c]ounsel's conclusion as to how best to advise a client in order to avoid, on the one

hand, failing to give advice and, on the other, coercing a plea enjoys a wide range of reasonableness because '[r]epresentation is an art,'" id. (quoting Strickland, 466 U.S. at 693). The Court finds nothing in the record to overcome the presumption of competence accorded to counsel's performance. Having failed to establish that his attorney's performance fell outside the wide range of what is considered reasonable conduct, Petitioner necessarily cannot establish that the C.P.L. § 440.10 court unreasonably applied Strickland in deny his claim.

### b.   Failure to Consult an Expert Witness

Petitioner argues that defense counsel, after learning of the ME's opinion at trial, should have requested a continuance to investigate, consult, and retain a medical expert of his own to rebut that opinion.   The portion of the testimony to which Petitioner refers is when the ME opined that a person who had suffered even one subdural hematoma would not have been able to talk, walk, or do anything normally. (See T.645-52).   When Petitioner raised this claim in his first C.P.L. § 440.10 motion, he attached copies of pages from various home medical reference books discussing the causes, symptoms, and treatment of subdural hematomas. Petitioner highlights various sentences on those pages indicating that symptoms of a subdural hemorrhage or hematoma may emerge weeks to months after the original precipitating event. See Pet'r Ex. E-5 to First C.P.L. § 440.10 Motion.

The trial court determined this ineffective assistance claim was "without foundation" because Petitioner had not shown that an expert was "available and willing to rebut" the ME's testimony. See First C.P.L. § 440.10 Order, p. 4. Furthermore, the trial court found, any expert "would have talked in general terms about acute subdural hematoma . . . and the so called 'lucid interval'" and "would not likely have provided any facts or evidence that would have exonerated" Petitioner. Id., pp. 4-5.

Courts uniformly have held that "[t]he decision whether to call an expert witness at trial generally falls within the realm of strategic choices that should not be second-guessed by a court on review." Rayford v. Greene, No. 02-CV-0811(VEB), 2008 WL 941706, at *8 (W.D.N.Y. Apr. 4, 2008) (citing United States v. Kirsh, 54 F.3d 1062, 1072 (2d Cir.) (finding that trial counsel's decision not to call fingerprint expert "was plainly a tactical decision and hardly bespeaks professional incompetence")). This holds true particularly where the petitioner "'has only presented his vague hope that another expert might have reached a different result than the government expert.'" Savinon v. Mazucca, 04 Civ. 1589, 2005 WL 2548032, at *33 (S.D.N.Y. Oct. 12, 2005) (quoting Leaks v. United States, 841 F. Supp. 536, 545 (S.D.N.Y. 1994); citations omitted), rep. and rec. adopted, 2005 WL 2548032 (S.D.N.Y. Sept. 18, 2006), aff'd, 318 F. App'x 41 (2d Cir. 2009); see also Rayford, 2008 WL 941706, at *8 ("Despite his claim that his trial counsel was

ineffective for failing to retain an expert, Rayford has provided no reason to believe that the defense would have been able to find an expert witness who would have testified as Rayford hoped."). As the trial court found, Petitioner's claim that defense counsel should have requested a continuance to call an expert to rebut Dr. Woytash's testimony regarding the victim's physical capabilities rests only on speculation that such an expert existed. See Savinon, 2005 WL 2548032, at *33 (finding claim speculative where habeas petitioner provided "no affidavit or other basis on which to conclude that there existed a witness who could have offered relevant and probative evidence contrary to the testimony offered by [the prosecution's medical expert]"). The pages from the home medical reference books submitted by Petitioner address only on a superficial level subdural hematomas, sustained under circumstances unlike what occurred here.[3] In any event, these documents do not establish that there was an expert willing to

---

[3]

    For instance, Petitioner excerpted pages from a section on "Subdural Hematoma" in Johns Hopkins Family Health Book, and highlighted the sentence, "Symptoms may emerge weeks to many months after the original trauma." Standing alone, this sentence appears helpful to Petitioner. However, Petitioner did not highlight the previous and subsequent sentences, which state that subdural hemorrhage or hematoma "is seen most often in seniors who have sustained a fall and struck their head" and that "[t]he person may not remember the head injury, especially if alcohol was involved." Pet'r Ex. E-5 to First C.P.L. § 440.10 Motion. There can be no serious contention that the beating Urbinato sustained is comparable in any way to an elderly person falling and bumping their head once, and not even remembering being injured. In addition, the book goes on to note that "[t]he degree of severity is associated with the amount of time elapsed between the initial development of symptoms and loss of consciousness. . . ." Id. This undermines Petitioner's argument regarding delay of symptom onset, given that Dr. Woytash stated that in a person of Urbinato's age, it would have taken severe blunt force to cause the size and degree of the subdural hematomas sustained. (T.644-45, 646).

testify for the defense regarding "what *this particular victim's* physical state was following the attack, especially in view of the fact that any outside medical expert would not have had the opportunity to examine the victim's body." First C.P.L. § 440.10 Order, pp. 4-5 (emphasis supplied). Because Petitioner has not overcome the presumption of reasonableness accorded to counsel's strategic decisions, and has not demonstrated prejudice, his claim fails under <u>Strickland</u>.

### c. Failure to Introduce Exculpatory Evidence

In his first C.P.L. § 440.10 motion, Petitioner asserted that trial counsel was in possession of documentary evidence disclosed by the prosecution prior to trial that "disprove[d]" Dr. Woytash's opinion testimony. <u>See</u> Pet'r First C.P.L. § 440.10 Motion, pp. 7-9 & Pet'r Exs. F-1 to F-3 (medical records). The records indicate that the police told the emergency medical services ("EMS") personnel that the victim was talking when the officers first arrived; EMS personnel stated that when they arrived about 10 minutes later, the victim was no longer talking and was posturing. <u>See</u> Pet'r Ex. F-2. As an initial matter, while these medical records arguably would have been admissible under the business records exception to the hearsay rule, any double hearsay contained in the report (such as the police officers' statements to the EMS personnel) would be "admissible only if each level of hearsay qualifies independently for a hearsay exception." <u>Lewis v.</u>

_Velez_, 149 F.R.D. 474, 487 (S.D.N.Y. 1993) (finding that "[t]his principle excludes much of the [prison] [incident] [r]eport, which is comprised largely of hearsay statements from correction officers involved in the May 1, 1989 incident") (citing FED. R. EVID. 805; _Eng v. Scully_, 146 F.R.D. 74, 79 (S.D.N.Y. 1993)). Assuming that the relevant portions of the records were admissible, the timeline described therein supported the prosecution's argument that in between the time 911 was called and the ambulance arrived, Petitioner had an additional 10 minutes to administer further injuries to the victim, at a time when he had been disarmed of the hammer and two screwdrivers.[4] In addition, the reports noted that the police were called to the scene for "an assault _in progress_". _See_ Pet'r Ex. F-2 (emphasis supplied). Trial counsel reasonably could have concluded that this characterization of the incident would have undermined the defense argument that it made no sense for Petitioner to continue assaulting Urbinato _after_ he had called 911. In short, Petitioner has not "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" _Strickland_, 466 U.S. at 689 (quotation omitted). For this reason, his claim fails. _See_, _e.g._, _Greiner v. Wells_, 417 F.3d 305, 324 (2d Cir. 2005) (declining to "fault

---

[4]
     _See_, _e.g._, T.741-42 ("But you know it was around ten minutes between the time the original call went out and the time that the first officer got there, so I'm going to pause for one minute. . . . The Defendant had ten times that to beat [Urbinato]'s brains out. . . .").

[counsel] for refusing to introduce evidence of the window-shooting incident in light of its 'significant potential downside,'-that it would have opened the door to a prosecution line of inquiry harmful to the defense") (internal quotation and citations omitted).

### d.   **Failure to Object to Prosecutorial Misconduct**

Petitioner faults trial counsel for failing to object to the instances of prosecutorial misconduct complained of in Ground Two, see Section III.B, supra. Notwithstanding the lack of preservation by timely objection, the Appellate Division reviewed Petitioner's prosecutorial misconduct claim on appeal and concluded, albeit without discussion, that it was among the claims that did not warrant reversal or modification. See McCallum, 96 A.D.3d at 1640-41. Therefore, Petitioner cannot establish that he was prejudiced by trial counsel's failure to lodge contemporaneous objections to the allegedly improper remarks. See, e.g., Swail v. Hunt, 742 F. Supp. 2d 352, 364 (W.D.N.Y. 2010) ("Swail cannot demonstrate that he was prejudiced by trial counsel's failure to preserve the insufficiency claim by means of a renewed motion for a trial order of dismissal after the defense case, because the Appellate Division considered the merits of the insufficiency claim, notwithstanding the lack of preservation.").

### E.   **Vindictive Sentencing (Ground Five)**

Petitioner contends that the trial judge, in setting his sentence, punished him for exercising his constitutional right to

a jury trial. The Fourth Department held that "the fact that the court imposed a more severe sentence after trial than that offered during plea negotiations does not demonstrate that defendant was punished for exercising his right to a trial[.]" McCallum, 96 A.D.3d at 1640 (citation omitted).

Federal courts routinely reject vindictive sentencing claims based on the disparity between sentences offered during the plea bargaining process and imposed after a guilty verdict. See, e.g., Archie v. Strack, 378 F. Supp. 2d 195, 200-01 (W.D.N.Y. 2005) ("The mere fact that the trial court, following conviction, imposed a high sentence does not, in and of itself, establish 'actual vindictiveness.'") (citing, inter alia, Corbitt v. New Jersey, 439 U.S. 212, 219, 223 (1978)). Here, there is "no suggestion that [Petitioner] was subjected to unwarranted charges[,]" Corbitt, 439 U.S. at 223, and the trial judge never stated or intimated that the sentence was based on Petitioner's refusal of various plea offers, see id. Instead, the judge's remarks indicate that, in arriving at the sentence, he focused on the severity of the victim's injuries, the disparity in size between Petitioner and the victim, and the inexplicably violent nature of the assault.[5] It was proper, and not

---

[5] For instance, the trial judge commented, "I'm trying to reconcile and understand what would cause this guy to deserve that kind of a beating once he had been disabled inside that apartment. And I think you just blew your top and lost control of yourself and you stuck it to him big time. . . . So this to me was a classic case of an excessive use of force and that what may have started out as—as a colorable claim of self-defense, all but evaporated once you took this guy, took him down." (S.7-8).

evidence of retaliatory motive, for the trial court to take these factors into consideration. The Fourth Department correctly applied federal law in rejecting Petitioner's assertion that he was punished for exercising his right to a trial.

## VI. Conclusion

For the foregoing reasons, Petitioner's application for a writ of habeas corpus is denied, and the petition (Dkt #1) is dismissed. Because Petitioner has failed to make a substantial showing of the denial of a constitutional right, the Court declines to issue a certificate of appealability. See 28 U.S.C. § 2253(c).

**SO ORDERED.**

S/Michael A. Telesca
_____
      HON. MICHAEL A. TELESCA
United States District Judge

Dated:     June 1, 2016
           Rochester, New York